in the case of Maralex. Good morning, William Zimski, Abidine Schill, on behalf of Maralex and the O'Hares. I'd like to save three minutes for rebuttal. You'll have to just watch your clock. I'm not going to tell you. I understand that. First off, we had four issues presented on appeal, and we are going to be conceding the first issue, that the government does, the BLM does have jurisdiction to inspect a lease site on non-federal land that is producing Indian and or federal minerals as well as fee minerals. So we're conceding that, and also the fourth issue about the warrantless inspections and property rights. You're conceding that? Yes. Here's the deal. I'm not a fan of citing to the oral argument record a decision. Yes. Because I've been in oral argument, and I've said things I really regretted. I've said many. Nervous tension and stupidity. Yes. But I think it would be helpful here if you would give us a 28-J letter or some type of document that would indicate your concessions on these issues. Yes, Your Honor. Thank you. And I will do that. And I inform counsel of that. Let me understand the scope of that second concession. You're conceding precisely what? Well, we had argued that the issue was whether those statutes violated the landowner's rights, not the operator's rights. Right. The landowner's rights. The landowner's rights. For Fourth Amendment. For taking purposes. And for taking. And for taking. And I think my sister's brief was, you know, I took that and analyzed it, and I think I agree with what she was saying. But our argument is somewhat informed when we talk about warrantless searches and the BLM doesn't have the statutory right to require the operator to provide a key to secured facilities ahead of time. And on that point is your second argument. The question there is whether it's a permissive correction action by the district court. And did you raise that issue before the district court? Yes, we raised it. The district court hadn't taken the action, so it's a little hard to argue it before the court does it. Well, the district court held that we did not reserve this on appeal. At the agency level. At the agency level. And in our opening brief, we cite to the appeal of incidents of that there was no statutory authority nor legitimate justification to give the BLM unbridled discretion to search facilities. And that unbridled discretion and thus the BLM's request for a key to any gates to conduct inspections is violative of Merrill Exe's rights. Yeah. I said, again, almost the same words from the statement of reasons for appeal. Were any conditions imposed on the BLM's right to enter? And should they have been? Yes. And did you request them to be? Well, the instance of noncompliance, the ink, they issued four, one for each well, stated that the condition or the action that had to be taken was to provide a key or allow them to place their own lock on the gate. Yeah, because facially, your argument has a lot of appeal that even though the BLM may have the right to enter, to inspect, even to conduct surprise inspections so that they that a driller and a well owner isn't jimmying the records before they show up, that still it seemed to be a little extreme to say to the BLM, here are the keys to my P-Title lab, come in whenever you please, thanks. I mean, that seems a little extreme. I spot you that. I'm just wondering, was the agency ever given an opportunity to impose conditions or were they requested to do so? Or did you argue, hey, gentlemen, you can't just give somebody a key to my land and just you come and go as you please. Well, that was our argument before the state director in the I-B-L-A and the district court. So implicit to that is you requested some kind of conditions or? Yes. Well, we acknowledge as we stand here before you, and I'll put it in the letter, that the BLM, the inspector, has the right to come to our site unannounced. But that unannounced is reasonable. But basically, if we give them a key, it's unaccompanied. And we believe that's unreasonable. In the statute, 1718 subsection B, it contemplates that the inspection will be accompanied. The inspector has to be properly identified. And it also says they may obtain immediate access to security facilities. So the statute contemplates there will be somebody there to allow them to open up any keys, any gates. Here, two well or four wells, two well sites are located on a ranch. It happens to be owned by the person that also owns the Merrill X. So in rural Colorado, and I guess rural everywhere, I would assume, but not the place I've been, there are a lot of locked gates. And, you know, people do that for site security. And that's actually one of the things that Congress was worried about, is site security. So by having a locked gate, I think they're satisfying one of the three things that the Congress was worried about. They're worried about site security. They're worried about protection against product theft. And so your problem here is not that they couldn't do what they did, but that the remedy that they proposed with the lock and key was too extreme. It was excessive. Unauthorized. Is that all that's left of this case? Is that whether they can have the lock and the key? Exactly. That's all that we have left of this case. And you're making an argument based on the statute and regulations, but also you've still got the Fourth Amendment. Well, yes. And I believe when the cases, the Dewey case was mine safety, and they said, well, Congress made a finding that mine safety is really important, and we need unannounced inspections to make sure you don't hide violations. And that's fine. We understand that. But it contemplates an accompanying inspection, like, okay, show me everything you have. Open up that door. Let me go down that mine shaft. Well, doesn't the regulation contemplate that there will be someone there on site? Isn't that written into the regulation? Couldn't you combine that with the key, and then your concern about them coming in on their own, why wouldn't that alleviate your concern? It would alleviate my concern, yeah. If there was somebody there. If there was somebody there. In a lot of places, you know, a well site, you know, a well pad is just pumping away and nobody's out there. I understand that. But there is reference in the regulation to having a person, responsible person, there. Yeah. Inspections normally would be conducted during the hours when responsible persons are expected to be present. And so that ties in with a contemplation, even under the regulation. It doesn't say that in the statute, but under the regulation, that, hey, somebody's going to be there. Right. And so is this case premature then? I mean, is the, do we have to, do you have to wait until they do something contrary to the regulation before the case is justiciable before us? Well, we have an. We have a justiciable controversy, I guess I'm asking. Well, we have an outstanding ink, instead of noncompliance, that we have, you know, and there's a corrective action to be taken. And you're conceding that you did deserve that ink. Right. Except you don't like that remedy that they propose. Correct. And then if you in the record, there was the last inspection. And I think it's in the record that page 86. It's August 13, 2013 inspection by a different inspector. Rodney Brashear said owner Merrill X met me at the gate to the property and allowed me to enter, inspect the wells and facilities pending the appeal of the state director review. Locations are in good condition. Equipment was in good condition as well. Meters were in calibration. And so inspections have been happening. Yes. This has been going on. I believe there's been that one. Not in the record, but I think there's been one a couple of years ago. The parties can't seem to work this out, even though it seems like they're doing inspections anyway. Yes. It's just that we we just want to make the record clear or have a document, a decision that we're not in violation by not having a a lock or not giving them a key or having a lock. So can I just ask on the Fourth Amendment on your Fourth Amendment argument, is that limited to the O'Hare's? Well, it's sort of it's sort of part of this argument, because if you look at Dewey and Barlow and they talk about, OK, you can have warrantless inspections if you have a statutory and regulatory system that provides for some type of regime where there there's some limits to inspections that you can't have unbridled inspections. Well, I'm just asking, is it is Merrill X making the Fourth Amendment claim or just the O'Hare's both? Both are making it, although although isn't there. Aren't you arguing that the O'Hare's have stronger privacy interests and Merrill X does? Yes, I think. But the BLM argued that, you know, they may be trespassing, but they're not illegally searching. Yeah. Well, that was my next question. In terms of mapping this on to the vast expanse of Fourth Amendment law, where does it all fit? Where where's the search? I mean, why isn't that a good argument that they may have got the key trespass? They aren't going into a home. They're just trying to get over to the wells. They have a limited they're bound by law to limit their search to the purposes of inspecting the wells. How does the Fourth Amendment search element get triggered here? Well, it gets triggered as far as as far as Merrill X concerned, because the Supreme Court cases that talk about the statutory regimes on inspecting mines, OSHA, family homes. What's your best case that that there's been a that there's a Fourth Amendment issue here in terms of the lock and key? Well, I believe Rush v. Bledsoe, which is the licensed family daycare center and Barlow, which is the OSHA case where they talk about a statutory warrantless search regime is fine, except for when it gives too much discretion to executive and administrative officers when and where the search. So therefore, under those circumstances, you do need a warrant. You know, it could be an administrative, obviously, administrative warrant. But so, again, it's very troubling. I get these cases organized in my head. And then you come here and you rip out issues that I've been studying for days. So if we're stuck with just the lock and key question, is that also the Fourth Amendment question? Well, or is there something else? The Fourth Amendment comes into consideration because if you under Chevron, if you're interpreting the agency's interpretation of a statute or or its implementation of a regulation, you can't or the court should not give deference if that interpretation causes some sort of constitutional harm. This warrant was around all of this. These tough questions that we're grappling with by saying, essentially, that you waived the arguments because you didn't raise them below. Yeah. Permissive action stuff. Yes. And again, I like your answer to that. Well, like I said, as I said, as I said in our statement for reason of appeal with the I.B.L.A. on page five of that, it's one or two of the state of the record, arguing there's no statutory authority or legitimate justification for BLM having unbridled discretion to inspect. And we also raised that with the state director. We're talking here about the kind of jurisdiction of the court. The court saying, well, I don't have jurisdiction because you didn't raise it. And you're saying, yes, I did raise it. Correct. I raised it. It's state director and the I.B.L.A. and the district court. Do we still have the issue of the number of inspections per year? Is that one gone, too? No, because, well, the the regulation says annually inspect for non-fee, non-federal or for non-federal, non-Indian sites. A minimum of? Isn't there a minimum of? A minimum of one a year on federal and Indian site lease sites, once a year under for non-federal, non-Indian sites. So that's still an issue is the number of inspections per year, in your view. It can be if they have a key. If they can't have the key. If they can't have a key. What are they permitted to do? They're permitted to inspect it annually. Only? Only. Once a year?  Unannounced? Unannounced. And, you know, as a practical matter, that means calling up, you know, these well sites are usually unattended. There might be a pumper there in the morning. But it means calling the operator and say, hey, meet me at this at the gate, which Mr. O'Hare did. But weren't the inks issued because they weren't allowed to do that? Well, they were issued because they weren't allowed. And then they said the remedy was give me a key or a lock. Because they weren't allowed? Yeah. So now when they go for the inspection, they call them up and they'll just meet them at the gate. What could the district court have done to assure compliance? What would be acceptable? What would have been acceptable to your clients? What would have kept you out of here? A decision that said the BLM had the right to inspect and unannounced. And that inspection would entail calling somebody up, the operator, and having them meet at the secured site and providing immediate access. And then use its usual contempt or other powers? Correct. Didn't do it? Correct. Am I correct that the term communitized area covers not just the immediate well site, but also the O'Hare's property? 320-acre drilling site. Section, yeah. For a spacing unit for a Fruitland coal formation well. And so there was not enough fee acreage to do a 320-acre site, nor was there enough Indian minerals to do a site. So they had to communitize. And what's the significance that the O'Hare's didn't sign the communitization agreement? That was significant with their not conceding their Fourth Amendment argument, which we were withdrawing. So if they had signed it, they wouldn't have a Fourth Amendment argument? Well, I think they would. Marillac signed it. Marillac signed it. They have a Fourth Amendment argument. Yes, yes. They would still have the Fourth Amendment argument. That was. Okay. I understand. Thank you. You're out of time by three minutes. Could you give counsel three minutes in addition? If she wants them. I'm going to pay it, please, the court. And excuse me, I was caught off guard a little bit by this, so I'm going to stumble through this a bit as the court is. I feel your pain. As we all were. Let me ask you this. Isn't the action of the district court here a bit extreme? I mean, look, I say to somebody, you can't enter my ranch, and the court says, here's the key to the other side. Come and go as you please. I mean, that sounds outrageous to me. Well, Your Honor. I guess that tells you my state of mind. I think what's important is we have to realize that whatever corrective action is provided for the agency has got to have at least three elements. The first of which is it's got to be. Yeah, but it doesn't have to include the ownership of the ranch. Hold that. Well, indeed, it doesn't grant that. What it has to be, number one, is an actual remedy to that which occurred, why the order was issued in the first place. BLM was denied entry. So we have to have a remedy that gets them entry, number one. Number two, it has to yield the type of access that the agency needs to carry out its statutory duty. Doesn't sound like communization. It sounds like communistization. No. So it has to yield the access that the agency needs. Number two. You don't need 365-day-a-year willy-nilly access. Number three, it cannot be at the whim of the owner, because that's what got us in this situation in the first place. Well, it's not a whim if you say to the guy, mea culpa, mea culpa. I'm sorry. I shouldn't have done that. I mean, okay, now you be at that gate on such and such a day. Your Honor, if you look at the record, that is what happened, and that's what caused the issuance of the order in the first place. The agent who wanted to come out to the facility emailed an employee of Marillex and said, I'm going to come out, and an inspector was told, I think that will be a problem. Let me get in touch with Mr. O'Hare. And indeed, when the agent came out, Mr. O'Hare did not allow him on the land. Therefore, if we have a setup where BLM calls and says, come out, they come out, and someone says, sorry, you can't come onto the property, we are back at the same spot. Now, I understand that, but let's read the headlines about the decision in this case. Tenth Circuit today decides if you deny the Federal Government access to your land on a communization agreement, the remedy is the Federal Government is going to get a key to your land. That's the way, and the Court said that's okay. And you know that's the way it's going to read in the West, right? Your Honor, to be completely honest with you, it's not clear what would work. Appellants haven't said. What they've said is give us what we had already, which is the ability to unlock the gate, but also the ability to say, we're not going to unlock the gate. Therefore, something has to allow for the key. Counsel, I didn't hear that from your opposing counsel. What I heard is that at least for the time being, things have changed. It isn't that the O'Hares are saying you can't come on and inspect. The inspections are being done. They've conceded that the BLM has authority to make once a year unannounced visits, and maybe I didn't hear correctly, but it sounds to me like going forward what they're saying is if you want to come and do an unannounced visit, fine, come and do it. We're going to let you do it. Isn't that where we are at this point? We have not been, that has not been a position that's been conveyed to BLM. What he was speaking of. Well, counsel, I'm asking you what's happening right now. And to be clear, let me make this clear, BLM has not come out to that property since those orders were issued. So in case, I heard the statements being made. There have been no inspections under the noncompliance order. All right, but given the concessions that we've heard today, why isn't this case moot? Because. Why does he need a key at this point? I'm sorry? Why do you need a key at this point? Because it is not clear that BLM will always be given immediate access when they arrive at the property to conduct an inspection. We practice law back in the country. I'll tell you what the district judge would do in those days and maybe what we should do. I think the Supreme Court effectively is doing that now. Go home and work it out. Go home and work this out. I mean, why don't you take a recess, go in the hall, and I want you to settle this case and come on in. That's what the judge used to do to us. I understand your point, Your Honor. But you now, given what's happened here this morning, could you just do that maybe? Potentially. Potentially. Potentially. But if you don't mind, while I'm here, I would like to. Meanwhile, back to Rand. So far, a point I would like to go back to is the question as to whether this was raised before IBLA, which rendered the final decision in this. That's the final agency action here. We have not the sentence, the statements that were read here. Those are from the papers that were submitted to the State Director of BLM. What was given to IBLA has been submitted to this Court on pages 39 of the opening brief and page 2 of the reply brief. If you look at those excerpts, nothing challenges the corrective actions under the statute or the regulations. There is a reason why the district court did not reach this issue, and it's because it was not addressed to IBLA. So I have yet to hear, and I have gone over these excerpts on the pages that I cited to you, and there is no challenge there. The challenge there to what? There is no challenge to the permissibility of the corrective actions under the statute or the regulations. Permissibility of corrective actions. Please translate. The corrective actions are the key. The key. The key and the lock. Those are the corrective actions under the noncompliance order. Well, is it enough that the plaintiff argues that the BLM does not have unbridled discretion to search? The BLM agrees with that. They agree with that in the district court. We agree with that now. It is not unlimited. Your Honor, you are going to the point of what the regulations speak to. They define parameters that set forth how inspections are to occur. In sections 3161B of the regulations, for example, it speaks to those regulations that are directed to communitization agreements. It speaks to site security only and measurements of oil and gas only and reporting of operations and productions only. It then goes on to say when the inspections will occur, when the normal hours of someone who would be present on the site. It addresses there will be a BLM representative who is authorized. It sets parameters. This is in no way unlimited. A BLM inspector is not going to come up at 3 in the morning and just start running around the property because that would be contrary to the regs. And the reason that's important is because this whole claim is hypothetical. It's based on the appellant's view of what BLM might do when they go out to conduct inspections under these orders. It has not been done yet. All right. That's why I asked whether it was premature. Indeed. And your point is? Well, maybe you guys will work it out. We have a settlement office. Mediation. Mediation it's called. And I'm well aware of it, and it's a good one, I guess. Good luck. Again, if you don't, just before I sit down, I didn't understand the Fourth Amendment claims to be directed to Marillex as well as the O'Hairs. As I understood, and as it was briefed, it was only to the O'Hairs. So I just raised that because I didn't understand it to be the case. What is your understanding of the Fourth Amendment claim, even if it is limited to the O'Hairs, and what's your response to it? Well, initially, as I said, it's based on hypothetical circumstances. Nothing has occurred that, and this is a significant infirmity, nothing has occurred that... So now you're saying it's not ripe. Yes. Yes. Well, that's one of the infirmities. It's also that it's as to undefined portions of land. They don't dispute that BLM can actually go on to the lease sites. The lease sites, and it's not clear from the record how things are established on the site, but the lease sites, I think we can all agree, would be where the records are kept. They're saying the BLM can go there, but... I think what they're saying is, okay, you win. Let us help us save face. Isn't that what they're saying? That's a pretty good place to start. I don't know. Actually, I don't know exactly what they're saying, which is why I'm so afraid to utter a word. But that's potentially it. But if there are any other questions... Well, maybe just to refine this a little bit. So the remedy was give us a key or let us put a lock, and that hasn't happened yet, right? Correct. No key, no lock. I'm wondering at what point, if there is a Fourth Amendment violation, what it would take to have one. So would the actual turning over of the key be the Fourth Amendment violation, or would it be the use of the key after it's turned over? Well, again, it's speculative, but I don't understand appellants to have established an actual search or seizure as defined under the Fourth Amendment, number one. And then we do have to go into all of the messy law of Fourth Amendment as to, for example, what constitutes requiring a warrant when you have a highly regulated business, which is what we have here, or when you have other circumstances. But we've explained in our brief that even if we assume that somehow there's been a search or will be a search under the Fourth Amendment, that under the Supreme Court precedents, a warrantless search would be permissible under the conditions that would exist here. I would like to get some clarity also as to whether or not there have been inspections. Your opposing counsel says there have been inspections since this brew hall. I believe he was answering that there have been inspections, period. There have not been any inspections since the issuance of the noncompliance order, meaning there have been no inspections under that order. Do you agree with that, counsel? Have there been inspections? You said there were. Yes. There is this inspection record. Okay. Could you add that? Could you add that to? August of 2013. Yes. So that was an inspection that occurred. Was this after? I don't know if this was after the noncompliance. The point I was making is there has not been an inspection under the provisions of the compliance order, meaning the noncompliance order, meaning the agency coming out under the circumstances there being a key or a BLM lock in place.  Well, yeah. And I apologize. Well, so I'm in the same place Judge Matheson is. Isn't this moot? If you all are going along and access is being provided, that you call and they come and they open the gate and you inspect and everyone is happy. Your Honor. Isn't that the end of this? Your Honor, we have two inspections for us to draw from. One in which BLM was not allowed access. One in which they were. I don't know what the third will be. But there is now a noncompliance order in place that says BLM is to come on to land. That hasn't occurred. So I don't know. I cannot say and I don't think anyone can say for certain what would happen on this third inspection, which is post noncompliance order. And one more point I wanted to make, Judge. By the way, is that document in the record that you were just passing back and forth? Yes. I believe so. It's page 86, Your Honor, of the appellant's appendix. Thank you. Judge Briscoe, you remembered there being an issue as to the number of inspections that occur. And I am sorry, Your Honor, I don't recall that being an issue. I know the regulations speak to annual inspections, but I don't remember anywhere in the briefing where appellants actually challenged the number of inspections. I thought they had. I'll get to read it again. You don't? This is fine. I like this. This is like a settlement. Let's just take a vote. All in favor of settlement say aye. All right. But did he answer? I didn't understand you to challenge the number of inspections. No, I did not. Did not what? I did not challenge the number of inspections. It's a once a year annual inspection. Okay, that's where you are. Okay. And do you want more than once a year? No, no, no, no. I'm just saying number of inspections is not at issue at all. That was my understanding. I'll tell you where you guys are going to end up. You're going to end up arguing about attorney fees because you put the BLM through a lot of hassle to bring them all the way to the Tenth Circuit by just not letting them have an inspection. So if you tell your client that, maybe he won't do it again. Unless the court has any other questions. Hearing none, thank you. The judgment of the district court should be affirmed. Case is submitted.